IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GREGORY FRANK,

|                    |            |                     |
|--------------------|------------|---------------------|
|                    | Plaintiff, | OPINION AND ORDER   |

    v.

22-cv-476-wmc

ANTHONY HENTZ
SANDRA ENDER
TAMMY MAASSEN
LILY LIU, and
DENISE HURLESS

              Defendants.

---

Plaintiff Gregory Frank, representing himself, was granted leave to proceed with claims that defendants Anthony Hentz, Sandra Ender, Tammy Maassen, Dr. Lily Liu, and Denise Hurless acted with deliberate indifference to his serious medical needs following knee-replacement surgery in violation of the Eighth Amendment. (Dkt. # 31.) Before the court are defendants' motions for summary judgment. (Dkt. ## 72, 76.) For the reasons explained below, the court will grant those motions.[1]

UNDISPUTED FACTS[2]

A.  The parties

At all times relevant, plaintiff Gregory Frank was in the custody of the Wisconsin

---

[1] In addition, defendants Ender, Hentz, Hurless, and Maassen's unopposed motion to amend their reply in support of their proposed findings of fact (dkt. #98) will be granted.

[2] Unless otherwise indicated, the facts in this section are drawn from defendant Liu's reply in support of their proposed findings of fact (dkt. # 95), defendants Ender, Hentz, Hurless, and Maassen's amended reply in support of their proposed findings of fact (dkt. # 98), and plaintiff's reply in support of his proposed findings of fact (dkt. # 97).

Department of Corrections ("DOC") and incarcerated at its Jackson Correctional Institution ("JCI").

Defendants Sandra Ender, Anthony Hentz, and Denise Hurless were all Nurse Clinicians in JCI's Health Services Unit ("HSU").  In this role, they treated and assessed inmates, assisted Advanced Care Practitioners ("ACP"), managed inmate medications, and maintained inmate medical records.  As nurses, however, they did not have the authority to prescribe medications, determine a plan of care, or override medical decisions made by an ACP.

In turn, defendant Tammy Maassen was a Health Services Manager ("HSM") at JCI.  In her role as HSM, Maassen managed and supervised health care services, monitored established plans of care, and "provid[ed] liaison activities" to other institutional units and care providers.  (Dkt. # 98-1, at 3.)

Finally, defendant Dr. Lily Liu was a medical doctor employed at seven DOC correctional institutions.  She worked two days a week at JCI.

### B. Plaintiff Frank's medical treatment

On February 23, 2022, Frank underwent a total left knee arthroplasty at Gundersen Health System ("Gundersen Clinic").[3]  In preparation for surgery, Dr. Liu ordered and Advance Practice Nurse Practitioner ("APNP") Wendy Demler wrote a medication order

---

[3] "Total knee arthroplasty" also called "total knee replacement, is a surgical procedure to resurface a knee damaged by arthritis.  Metal and plastic parts are used to cap the ends of the bones that form the knee joint, along with the kneecap.  This surgery may be considered for someone who has severe arthritis or a severe knee injury." Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/knee-replacement-surgery-procedure (last visited July 16, 2026).

for 5mg-325mg oral tablets of Hydrocodone-acetaminophen ("Norco").  (Dkt. # 26-1, at 1; dkt. #20-1, at 131, 138.)   The administration of Norco was ordered to begin when Frank returned to JCI, with the medication to be taken four times a day for three days. (*Id.*)

Following his surgery, a prescription was also written and signed by a Gundersen Health System APNP, Molly Willenbring, which called for: 28 tablets of apixaban (Eliquis), which were to be taken "2 times daily for 14 days for deep vein thrombosis prevention in knee"; 30 tablets of oxycodone to be taken "by mouth every 6 hours as needed for pain (severe pain);" and 30 tablets of tramadol to be taken "every 6 hours as needed for pain (moderate pain)" ("the Gundersen Prescription").  (Dkt. # 31-5, at 1.) Administration of these drugs was to begin on February 24, and each drug prescription was non-refillable.  (*Id.*)  In the Gundersen Clinic's discharge instructions, APNP Willenbring stated "patient to return to DOC with preoperative medications unchanged and addition of Eliquis for dvt prophylaxis for 2 weeks and pain medications as needed for one month." (Dkt. # 78-1, at 11.)   Consistent with Division of Adult Institutions ("DAI") Policy #500.30.02(V)(B), which requires DOC ACPs to review offsite recommendations prior to implementation, dkt. #32-1, at 4, Dr. Liu ordered that upon Frank's return JCI should continue "with pre-op medication and add [Eliquis] for DVT for two weeks and pain medications as needed for one month, JCI."  (Dkt. # 26-1, at 2.)

On February 24, 2022, Frank returned to JCI and met with Nurse Ender and a physical therapist.  At that time, Ender noted that Frank was experiencing pain at a scale of eight out of ten; she was not sure "if his pain will be managed well"; and she gave Frank

3

a prescribed oral tablet of Norco. (Dkt. # 20-1, at 31.) With physical therapy, Frank again reported his pain at an eight out of ten. The physical therapist indicated that the plan was to have one visit a week for six weeks, with the treatment to include: "manual therapy, neuromuscular reeducation, orthotic training, therapeutic activities, therapeutic exercises, and thermal/light modalities." (Dkt. #20-1, at 25.)

On February 25, Frank was seen by Ender for a dressing change. During the dressing change, Ender cleaned Frank's knee and placed a dry dressing that was rewrapped with an ace bandage. At that time, Ender observed "quite a bit of bruising" on Frank's knee. (Dkt. #20-1, at 2-3.) Ender also noted that Frank "has some pain but wants to come to HSU only a couple times a day." (*Id.*) That same day, Frank received two tablets of Norco, even though he was permitted to take it up to four times a day.

The following day, February 26, Frank was again seen for a dressing change by a non-defendant nurse, who replaced the previous wrap and dressing with new dressings and again wrapped the knee in an ace bandage for compression. That nurse also noted that Frank's knee "remains extremely bruised and swollen, however, the edema is much reduced." (*Id.*) Once again, Frank only took two tablets of Norco.

The next day, February 27, Frank was seen by Nurse Hurless for yet another dressing change. Hurless observed "very minimal drainage" compared to Frank's previous dressing, but noted that swelling and bruising on Frank's knee was still present. (*Id.*) During this dressing change, Frank reported that the "pain is much better" and he was "able to walk using a walker." (*Id.*) Hurless also instructed Frank to contact HSU with any concerns. Frank took two tablets of Norco that day, then only one tablet the following

4

day, February 28.

On March 1, Frank underwent an additional dressing change, with HSU staff noting that the surgical site was "clean dry and intact." (*Id.*) While Frank's knee was still displaying moderate bruising in different shades, there were no signs or symptoms of infection noted. Frank also "report[ed] not having taken anything for pain control and that he has been ambulating more." (*Id.*) HSU staff informed Frank to elevate his knee and changed this compression wrapping to "Tubigrip." Also on March 1, Frank filed a Health Service Request ("HSR"), stating that his bandage had not been replaced or his wound checked in two days. Nurse Hentz responded on March 2, reminding Frank that he had been seen by nursing staff on March 1 and advising that he would be seen again by nursing staff that same day. Frank apparently saw Nurse Ender on March 2, for a dressing change. However, he did not apply any new dressing because there was no sign of drainage. Instead, Ender observed bruising "up to the hip area and around the entire upper thigh" and "down the front of his leg too." (*Id.* at 1.)

On March 3, Frank was seen for his weekly physical therapy. During physical therapy, Frank rated his pain as a seven out of ten and stated that he still uses a cane and walker for longer distances. The physical therapist noted that there was a buildup of fluid in his joint, Frank's incision was clean, there were no signs of infection, and Frank's physical therapy had been "progressing well." (*Id.* at 23-24.) Still, that same day, Frank filed an HSR which inquired "why [his] pain meds stopped without asking" and mentioned that his pain levels had been "between 7+9" out of ten. (*Id.* at 16.)

On March 4, Nurse Hentz again responded, informing Frank that his Norco

prescription was only for 3 days as a "temporary post-op prescription." (*Id.*)  Hentz also reminded Frank that he had extra strength Tylenol, which he was prescribed to take three times a day to help manage his pain, neither mentioned his tramadol prescription for moderate pain nor his prescription for oxycodone from the Gundersen Prescription, the latter of which was likely precluded from use under JCI policy.  Also on March 4, Frank filed yet another HSR notifying HSU staff that: he was in "constant 7-8 ½ or 9 pain"; he needs some relief; and the pain is "[a]ffecting both [his] physical and mental state." (*Id.* at 15.)  Hentz responded to this HSR on March 5 by scheduling a "sick call," for which Frank was seen by Nurse Hurless that same day.  As part of her nursing triage on that occasion, Hurless noted that Frank's pain was in his left leg from hip to ankle at a pain scale of seven out of ten.  (*Id.* at 11.)  Hurless also noted that the area is "swollen and bruised from hip to ankle" and that Frank was seeking more pain medication.  (*Id.*)  Finally, Hurless advised that Frank's provider would be contacted.

After this assessment, Nurse Hurless also messaged Dr. Liu, notifying her that Frank was reporting severe pain and an inability to sleep at night, despite taking 1000mg of acetaminophen (Tylenol) three times a day, as well as observing that Frank now had swelling from his left hip to his ankle.  In addition, Hurless advised Dr. Liu that she put in a referral for evaluation of his leg.

On March 9, now two weeks from his knee replacement surgery, Frank had another physical therapy session, after which the physical therapist reported that Frank was able to walk to the HSU without any assistive devices, walking roughly a quarter mile.  In her notes, the therapist also commented that Frank's swelling was "mild," while "doing very

well with gait and [range of motion]." (*Id.* at 22-23.) Also on March 9, HSU staff participated in a "nurse only post-op phone call" with the Gundersen Clinic. *(Id.* at 47.) During that call, HSU staff reported that Frank was still ambulating with a walker, his incision is "clean, dry, and intact," and he will have x-rays completed in four weeks at corrections. (*Id.*)

On March 10, Dr. Liu returned to JCI, read Nurse Hurless' March 5 email noting Frank's reports of severe pain, and responded to it. Specifically, Dr. Liu advised Frank to use ice or warm packs four times a day (or as needed), to elevate his leg, and not to take any NSAIDS (nonsteroidal anti-inflammatory drugs). In addition, Dr. Liu prescribed 50mg of tramadol every night at bedtime for seven nights to help alleviate Frank's pain.

On March 11, Nurse Ender again met with Frank to check on his pain level and activity. At that time, Ender noted that Frank reported experiencing pain on a scale of eight out of ten, which was "bad enough [that] he has not been sleeping well" and walked "as little as he possibly can." (*Id.* at 10.) During the meeting, Ender observed that Frank's "incision line [was] healing nicely"; "the entire knee to hip appears swollen and blanched when touched"; and the area had no warmth "when compared to the rest of his leg." (*Id.* at 11.) Consistent with Dr. Liu's order, Ender informed Frank that he had been prescribed tramadol at night, which Frank later requested. Ender also reminded Frank to keep his leg elevated as much as possible and to use ice/warm packs when needed, but that he is unable to take NSAIDs.

In response to the care he had been provided to date, Frank filed an inmate complaint on March 14, contending that he had not been provided "adequate" pain

7

medications following his knee replacement surgery. (Dkt. #20-2, at 11.) To assist in the investigation of this inmate complaint, HSM Maassen reviewed Frank's medical records, but concluded that the regular contact by nurses and physical therapy did not support Frank's claim of inadequate care in addressing his medical needs. (*Id.* at 8.) Following Maassen's review of Frank's medical records, therefore, his inmate complaint was dismissed.

On March 15, Frank had his next physical therapy session, which noted that Frank had "no new complaints." (Dkt. # 20-1, at 22.) Overall, the physical therapist determined that Frank was "doing very well," with his "range of motion near normal limits." (*Id.*) Additionally, the therapist noted that Frank was now able to walk without any assistive devices, although still walking with a limp.

Despite Frank's improvements, he continued to experience pain, prompting him to submit an HSR on March 21. In particular, Frank highlighted that he is "still having acute pain in his left leg/knee 6.5-8." (*Id.* at 14.) Frank further stated that despite his using both heat and ice, he was still experiencing aching pain, sensitivity to touch, and severe sharp stabbing pains. HSU staff responded to Frank's HSR the following day, March 22, notifying him that an appointment had been scheduled. Following his receipt of this response. Frank filed an additional HSR that same day, asking if the HSU staff "could be a little more specific as to when [he] will be seen." (*Id.* at 13.) The next day, Nurse Hentz responded that Frank would be seen by a nurse that week. Also on March 22, Frank had another physical therapy session, during which he reported his pain had increased since his access to pain medications had ended, leading Frank to become frustrated with the "lack

of pain control." (*Id.* at 21.)  Frank had also gone back to using a rolling walker.  Even so, the therapist noted that Frank was "functioning well" with the increased pain he reported experiencing.  (*Id.*)

Following up on Frank's two, most recent HSRs, Nurse Hentz also conducted another nursing sick call with Frank on March 24, now four weeks from his knee replacement surgery.  During that call, Frank reported experiencing pain on a scale of seven out of 10, localized in three locations -- his posterior left upper leg, left knee, and his left shin.  (*Id.* at 7.)  Frank also emphasized that:  his pain was ongoing; there has not been much progress with pain management; and he is now having more difficulty sleeping.  Because of this continuing pain, Frank inquired about receiving NSAIDs.  In response, Hentz informed Frank that he would send a message to his provider.  (*Id.* at 9.)  That same day, Hentz messaged Dr. Liu, informing her of Frank's most recent complaints.  Nurse Hentz also highlighted that his left knee now felt warm to the touch with "increased pink" compared to his right, although Frank himself did not think these were new developments.  (*Id.* at 8.)  Hentz also inquired about putting in an order for x-rays on Frank's knee.  (*Id.* at 35.)  The next day, Dr. Liu responded, telling Hentz that if Frank's pain is related to his post-operative knee, then he should be sent back to orthopedics.

On March 28, Frank filed another inmate complaint claiming "non-treatment for acute/chronic pain in [his] left leg" based on a failure to be seen by nursing staff until March 24.  (Dkt. #20-3, at 9.)  As with Frank's previous complaint, HSM Maassen was contacted.  After reviewing his medical records, however, Massen determined once more that Frank had been regularly seen by nurses and his physical therapist.  Even so, Frank's

9

complaint was ultimately affirmed after his appeal within JCI because requests for care identifying symptoms required a face-to-face encounter within twenty-four hours of receipt of the HSR. Thus, since Frank's HSR complaining of pain was received on March 22, and Hentz's follow up sick call was not until March 24, the institution's response was untimely under JCI's internal procedures. (*Id.* at 4.)

Frank was next seen for physical therapy on March 29, after which the physical therapist notified Dr. Liu that Frank was doing well in regard to his range of motion and strength, but he had a new complaint of ankle pain, in addition to his "primary complaint" of "pain in the hamstring." (Dkt. #20-1, at 34.) Still, the physical therapist recommended an ultrasound "to be on the safe side," given Frank's history of a pulmonary embolism following his last surgery. (*Id.*)

On April 4, Dr. Liu advised the physical therapist that his comments were "noted" and that she had requested a nursing sick call for Frank. During that call, Frank reported to Nurse Hentz that he was now having pain at a scale of "5-6/10 instead of a 7-8/10" and was trying to be as active as he can without causing more pain, which was concentrated in "the inner portion of left knee, left shin, a horizontal band across the lower left thigh, and incision pain to left knee." (*Id.* at 5.) Additionally, Hentz noted that Frank's ankle pain had ceased, and he noted no swelling or inflammation in Frank's knee and leg that would raise any concerns of deep vein thrombosis.

On April 6, Frank underwent an x-ray of his left knee, which showed no fracture or dislocation. Additionally, the knee replacement hardware was present, and Frank's soft tissues were "unremarkable." (*Id.* at 29.) Following a review of his x-rays, Frank's six-week

10

post-operation orthopedic clinical visit was cancelled because the DOC would send Frank's x-rays to the clinic.

Frank returned to physical therapy on April 8 with no new complaints, his strength good, no deviation in his gait, and his range of motion within functional limits. Indeed, the therapist found Frank was "progressing appropriately." (*Id.* at 40.) Frank was next seen for physical therapy on April 20, reporting that he was still experiencing some hamstring pain and felt as though he may be walking with a slight limp, but, just as he did on April 8, presented with no deviation in his gait, and both his strength and range of motion within functional limits. As a result, Frank's therapist commented that he "is doing well functionally with some lingering pain." (*Id.* at 39.)

Frank was seen by Nurse Ender roughly one month later, on May 8, after he complained about not having enough Tylenol. In response, Ender notified Dr. Liu to ask (1) if Frank could have more ordered and (2) whether Dr. Liu wanted to evaluate Frank's ongoing medication orders for Tylenol. On May 10, Dr. Liu responded that Frank had already been receiving twice the allowable amount of Tylenol per month, meaning that he would have to supplement any additional Tylenol himself from the canteen. That same day, Ender explained that Frank would be receiving less Tylenol than his normal one hundred eighty per month, because Tylenol would now be issued in boxes of twenty-four, instead of fifty. Frank viewed this as unfair treatment.

On June 29 Frank was seen by a physical therapist at JCI for the last time in response to another HSR filed on June 26. During this session, Frank stated that he still had "some left knee pain and crepitus," but he was walking, had attempted jogging, and had even been

11

playing volleyball.  (*Id.* at 18.)  The therapist further observed that Frank "is doing very well and has met all PT goals."  (*Id*. at 26.)


OPINION

Plaintiff contends that defendants were deliberately indifferent to his medical needs by failing to provide adequate medical care.  Specifically, he claims that by failing to provide narcotic pain medications in accordance with the Gundersen Prescription and other prescribed pain medication "as needed per month," defendants acted with deliberate indifference to his ongoing post-operative knee and related leg pain.  (Dkt. #88, at 8.) Defendants move for summary judgement on all of plaintiff claims, contending that the care they provided exceeded constitutional standards, and also that they are alternatively entitled to qualified immunity.

Summary judgement must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  Irrelevant and unnecessary factual disputes that do not affect the outcome of the suit do not preclude summary judgment. *United States v. McGaughey*, 977 F.2d 1067, 1073 (7th Cir. 1992).

To begin, "[t]he moving party bears the initial burden of demonstrating that no genuine issue of material fact exists."  *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).  Once that showing has been made, "the burden shifts to the party opposing summary judgment to present specific facts demonstrating a genuine issue for

trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  When evaluating a motion for summary judgment, a court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party, *Scott v. Harris,* 550 U.S. 372, 378 (2007), and "may not weigh conflicting evidence or make credibility determinations," *Whitaker v. Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025).  Moreover, courts may consider only admissible evidence, and reasonable inferences made in favor of the non-movant, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); mere "speculation or conjecture" is insufficient.  *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025).

## I. Deliberate indifference

The Eighth Amendment's prohibition on cruel and unusual punishment prohibits prison officials from acting with deliberate indifference to a prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Pyles v. Fahim,* 771 F.3d 403, 408 (7th Cir. 2014).   Deliberate indifference under the Eighth Amendment has both an objective and subjective component.  *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The objective component requires a plaintiff to demonstrate that he had a serious medical condition.  *Id.*  The subjective component requires a plaintiff to demonstrate that a prison official "acted with a 'sufficiently culpable state of mind,'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)), that is to say that the official must have actually known of a substantial risk of serious harm and disregarded that risk.  *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).  This subjective component "'requires more than mere negligence and it approaches intentional wrongdoing,'" which has prompted courts to compare this component to a criminal recklessness standard.  *Burton v. Downey*, 805 F.3d

13

776, 784 (7th Cir. 2015) (quoting *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012)).

When alleging deliberate indifference where *some* medical treatment was provided, the question then becomes whether the "medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Generally speaking, courts give deference to a professional's treatment decision, unless "no minimally competent professional would have so responded under those circumstances." *Pyles,* 771 F.3d at 409. First, when making this analysis, courts "must examine the totality of an inmate's medical care." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Finally, mere "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles,* 771 F.3d at 409; *Moore v. Hoffman*, No. 20-cv-918-wmc, 2023 WL 8764689, at *6 (W.D. Wis. Dec. 19, 2023).

### A. Claimed Departures from Claimed DOC Policies Regarding Administration of Prescribed Pain Medications

The court begins by addressing plaintiff's argument that each defendant was deliberately indifferent based on an alleged violation of DAI Policy #500.20.02(I)(A), which states "[t]he DOC may contract outside ACPs to provide health care services face to face or via technological means (i.e. Telemedicine) for patients where an established relationship for service exists. The DOC shall accept orders as written." (Dkt. 32-1, at 2.)

14

Plaintiff asserts that this policy required defendants to follow the so-called "Gundersen Prescription," which included an unrefillable prescription of thirty tablets of oxycodone and thirty tablets of tramadol.  (Dkt. #88, at 10; dkt. # 31-5, at 1.) Additionally, if there were to be a departure from the Gundersen Prescription, plaintiff claims that DAI Policy #500.30.02(V)(F)(l-3) required JCI to document the rationale for a significant change of that prescription in forms to be completed and scanned, which he claims was not done.  (Dkt. # 88, at 10-11; dkt. # 32-1, at 4.)  However, as defendants note, 42 U.S.C. § 1983 allows plaintiff to pursue actions for violations of constitutional and federal law, *not* violations of DOC policy.  *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *see Martinez v. Hedrick*, 36 F. App'x 209, 212 (7th Cir. 2002) (affirming summary judgment even when a defendant's actions violated prison policy when no showing of deliberate indifference had been made).  As a result, to succeed on his claim of deliberate indifference, plaintiff must make a demonstration under the applicable constitutional standard discussed above.  Taking the defendant medical providers by category, the court does just that below.

## B. Nurse Defendants

### 1. Defendants Hentz, Ender, and Hurless

Based on the totality of care provided to plaintiff, no reasonable jury could determine that Nurses Hentz, Ender, or Hurless rose to a standard of deliberate indifference to plaintiff's post-operative medical needs, including his subjective reports of pain.  Rather, the undisputed record demonstrates that these nurses were each far from indifferent to plaintiff's post-operative condition and made affirmative, prompt efforts to

assess *and* address plaintiff's complaints of pain and report any concerns to his ACPs. To begin, during his recovery, plaintiff was consistently seen and treated by Nurse Hentz. On March 2, he responded to plaintiff's HSR regarding not having a dressing change in two days by informing him that he was seen on March 1 and would be seen again that same day. On March 4, Hentz responded to plaintiff's HSR discussing the termination of his narcotic pain medications by explaining that his Norco prescription was only a "temporary post-op prescription," of a few days. (Dkt. # 78-2, at 19.) On March 5, Hentz addressed another HSR regarding plaintiff's constant pain by scheduling a nursing sick call. Following an HSR on March 22, Hentz again responded to plaintiff the next day, informing him that he was scheduled to see a nurse that week. On March 24, Hentz again met with plaintiff in response to his complaints of continuing pain. Hentz next saw Frank for another nursing sick call on April 4 to assess plaintiff's knee for deep vein thrombosis, which was not present. Based on his prompt responses to plaintiff's HSRs, evaluations during the nursing sick calls, and most importantly, prompt messages relaying plaintiff's pain complaints to Dr. Liu, no reasonable jury could conclude that Hentz acted with deliberate indifference to plaintiff's medical needs.[4]

Following his surgery, plaintiff was also routinely visited and treated by Nurse Ender. On February 24, Ender met with plaintiff for his offsite return, where she gave him

---

[4] At most, Nurse Hentz might be faulted for failing to recognize the possibility of offering tramadol as an additional pain relief option identified in the Gundersen Prescription. However, this would be meant deviating from the treatment plan created by plaintiff's primary provider Dr. Liu, and, against all his other efforts, this is *at most* evidence of negligence, not deliberate indifference. Indeed, Dr. Liu, in whom Hentz had a right to rely *and* plaintiff himself, who was made aware of this prescription are more responsible for not recognizing this option.

a tablet of Norco as prescribed by Dr. Liu.  Ender also saw him the next day and performed a dressing change.  Next, on March 2, Ender saw plaintiff for another dressing change.  On March 11, she again met with plaintiff following a request to check on his pain levels and gave him a tablet of tramadol in accordance with Dr. Liu's March 10 prescription. Following plaintiff's complaint of lacking Tylenol, Ender also promptly contacted Dr. Liu on May 8 and informed Dr. Liu of his complaint.  After Dr. Liu responded, Ender spoke to plaintiff on May 10, informing him that any change in Tylenol was due to a shift in the quantity of Tylenol in each box, and Dr. Liu had instructed that plaintiff himself would need to be supplement any additional need for Tylenol through JCI's canteen.  Finally, when plaintiff shared that this change felt unfair, Ender dutifully relayed that information to Dr. Liu, whose call is was as an advance practitioner, not Ender.  (Dkt. #20-1, at 32-33.)  Thus, based on Ender's own care and responses to plaintiff's complaints, therefore, no reasonable inference of deliberate indifference can be drawn against her either.

Finally, no reasonable jury could conclude from the record that Nurse Hurless acted with deliberate indifference towards plaintiff's medical needs.  To the contrary, on February 27, Hurless met with plaintiff, where she changed his dressing.  Next, on March 5, Hurless met with plaintiff in response to his complaints of pain.  Even then, because plaintiff indicated that he wanted more pain medication during the meeting, Hurless appropriately contacted Dr. Liu as a prescribing authority that *same* day to inform her of plaintiff's complaints of severe pain and that she had put in a referral for evaluation of his leg.

In short, the record establishes that defendants Hentz, Ender, and Hurless routinely

17

made contact and provided care to plaintiff within the bounds of ordinary and prompt medical care by nurses. The record indicates that they changed dressings, monitored and reported his condition, promptly responded to his HSRs, and relayed his concerns and complaints of pain to his providers. This care by defendants addressing plaintiff's medical needs and pain complaints is the "sort of meaningful and ongoing assessment of a patient's condition [that] is [the] antithesis of 'deliberate indifference.'" *McGee v. Adams*, 721 F.3d 474, 482 (7th Cir. 2013) (finding no deliberate indifference when medical professional defendants regularly evaluated the defendant, held a special staff meeting regarding plaintiff's complaint of pain, and discussed plaintiff's condition with him).

Ultimately, plaintiff's issue with the care provided by defendants Hentz, Hurless, and Ender was their failure to give him narcotic medication in the face of his complaints of pain. However, as noted above, nurses cannot prescribe medications or determine plaintiff's plan of care, they must defer to the decisions of his JCI ACPs, APNP Demler and Dr. Liu's, who prescribed more conservative pain medication. Although plaintiff would have preferred more and stronger narcotic medication consistent with the Gundersen Prescription, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication" nor guarantee that plaintiff has a "pain free" recovery. *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023). Instead, as discussed above, plaintiff must show that defendants were deliberately indifferent to his medical needs by showing their care "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Cole,* 94 F.3d at 261-262. Here, plaintiff's medical record

18

fails to suggest any basis, and plaintiff fails to present any evidence, on which a reasonable jury could conclude that Hentz, Ender, or Hurless were deliberately indifferent to plaintiff's medical needs. *See Dvorak v. Douglas Cnty. Sheriff,* No. 07-C-219, 2008 WL 2512869, at *6 (E.D. Wis. June 20, 2008) (finding no deliberate indifference by a jail nurse for a failure to give narcotic pain medication because they were following doctor's orders and could not prescribe or dispense narcotic medications). Accordingly, defendants Hentz, Ender, and Hurless are entitled to summary judgment as a matter of law.

### 2. Defendant Maassen

As to HSM Maassen's care, plaintiff alleges deliberate indifference by turning a "blind eye" to plaintiff's complaints of pain when examining his medical record and recommending the dismissal of plaintiff's inmate complaints. (Dkt. # 32, at 9.) plaintiff asserts further that Maassen was deliberately indifferent by "not intervening to correct the actions and inactions of staff [that] she supervised and as an RN herself." (*Id.*) However, plaintiff provides no evidence to support any finding that the care provided by Hentz, Hurless, and Hentz, which Maassen found to be adequate based on her professional judgment, was at a standard that "no minimally competent professional" would have chosen. *Pyles,* 771 F.3d at 409. Additionally, Maassen cannot be held liable simply because she held a supervisory role over Hentz, Hurless, and Ender. *See, Moore,* 2023 WL 8764689, at *5 (finding that an HSU manager cannot be held liable "simply on her supervisory role of others" and that she was not deliberately indifferent when her only involvement was reviewing and responding to plaintiff's HSR, which were responded to promptly).

As with defendants Hentz, Hurless, and Ender, therefore, plaintiff's real claims with respect to Maassen's care is her alleged failure to give him narcotic medication in the face of his complaints of pain. However, for the same reasons as Nurses Hentz, Hurless, and Ender, plaintiff has failed to show that Maassen's activities amounted to negligence, much less deliberate indifference to plaintiff's serious medical needs. Accordingly, defendant Maassen is also entitled to summary judgment as a matter of law.

## C. Defendant Lily Liu

As to Dr. Liu's medical treatment of plaintiff, he cites no evidence, and the medical record also fails to support a finding, from which a reasonable jury could find that Dr. Liu acted with deliberate indifference to plaintiff's medical needs. To support his claim, plaintiff would emphasize a five-day delay between March 5 and March 10 during which Dr. Liu did not respond to a message from Hurless regarding his pain, causing him to "suffer." (Dkt. #88, at 9.) However, Dr. Liu was not at JCI on March 5, and she did not return until March 10 consistent with her contract with the DOC, leaving her unaware of plaintiff's complaint of pain until March 10, after which she promptly followed up with new orders. (Dkt. # 95, at 18.) Because Dr. Liu was unaware of plaintiff's March 5 pain complaints, the five-day delay in treatment was largely out of her control, meaning that while she and nurses aware of her lack of availability may have been negligent, no reasonable jury could find Dr. Liu acted with deliberate indifference to plaintiff's needs. *See Walker v. Benjamin,* 293 F.3d 1030, 1038 (7th Cir. 2002) (finding no deliberate indifference when delays in care were not in a doctor's control). Specifically, without evidence that she knew of Hurless's message regarding plaintiff's post-surgery pain, Dr. Liu

20

cannot be found to have disregarded any risk of serious harm as required to establish deliberate indifference. *See Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (finding that prison officials act with deliberate indifference only if the official "*actually knew of* and disregarded a substantial risk of harm") (emphasis added).

Additionally, plaintiff asserts that Dr. Liu's tramadol prescription from March 11 to March 17 was "inadequate and deliberately indifferent." (Dkt. # 88, at 8-9.)  However, plaintiff offers no evidence to suggest that this prescription was a substantial departure from *any* recognized professional judgment or standard. *Cole,* 94 F.3d at 261-62.  Without evidence that the pain management ordered by Dr. Liu deviated from professional judgment, no reasonable jury could conclude that Dr. Liu acted with deliberate indifference to plaintiff's care. *See Burton v. Downey,* 805 F.3d 776, 785 (7th Cir. 2015) ("We agree with defendants that no reasonable jury could conclude that the failure to prescribe narcotic pain medication or contact a doctor who would prescribe it amounted to deliberate indifference.  Surely [plaintiff] would have preferred Vicodin to Ultram, or to have seen a doctor who would have prescribed narcotics, but detainees are not entitled to receive 'unqualified access to healthcare.'") (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)); *See also Lockett v. Bonson,* 937 F.3d 1016, 1024 (7th Cir. 2019) ("We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment.")  The closest plaintiff has to offer is the difference between the Gundersen Prescription and the prescriptions authored by Dr. Liu and APNP Demler.  However, "evidence that another doctor would have followed a different course of treatment is

21

insufficient to sustain a deliberate indifference claim." *Burton v. Downey*, 805 F.3d 776, 786 (7th Cir. 2015).

Finally, plaintiff appears to suggest that Dr. Liu's recommendation to refer plaintiff to orthopedics on March 25 could be found at be an act of deliberate indifference because she personally failed to respond "with an order and prescription to provide pain relief." (Dkt. #31, at 8.)  However, as with Dr. Liu's other treatment and prescriptions, plaintiff offers no evidence to suggest this choice departed from professional judgment in a way that would support a finding of deliberate indifference.  For all these reasons, no reasonable juror could conclude that Dr. Liu acted with deliberate indifference in violation of the Eighth Amendment, and she, too, is entitled to summary judgment as a matter of law.

## II. Qualified immunity

Defendants have also asserted the defense of qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once the defense is raised, a plaintiff bears the burden of defeating the immunity by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023).  "'A failure to show either is fatal for the plaintiff's case.'" *Fosnight v. Jones*, 41 F.4th 916, 924 (7th Cir. 2022) (*quoting Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)).

Plaintiff first argues that defendants are not entitled to qualified immunity because

22

DAI Policy 500.30.02 rendered their treatment decisions non-discretionary. (Dkt. # 88, at 4-5.) However, plaintiff provides no evidence to support that this policy required defendants to follow the Gundersen Prescription nor that failing to follow it was a constitutional violation. To the contrary, as noted above, courts have held a violation of state policy does *not* on its own establish the violation of an inmate's constitutional rights. *Scott,* 346 F.3d at 760 ("However, 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices."); *see Poff v. Scullion*, No. 23-cv-598-wmc, 2025 WL 993788, at *3 (W.D. Wis. Feb. 26, 2025) ("Policy violations, standing alone, are not actionable under § 1983.").

Plaintiff also argues that his right to access the drugs ordered in the Gunderson Prescription was clearly established. For the purposes of qualified immunity, however, a right is clearly established when "the law is sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Sabo v. Erickson*, 128 F.4th 836, 844 (7th Cir. 2025) (citation omitted). Existing precedent must "place the constitutional or statutory 'question beyond debate.'" *Id.* (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). Specifically, in "considering deliberate-indifference claims challenging the medical judgment of prison healthcare personnel, qualified-immunity analysis requires us to frame the legal question with reasonable specificity." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019). To support his argument here, plaintiff relies heavily on the Supreme Court's previously cited *Estelle* decision. However, that opinion fails to place the alleged constitutional violation by defendants "beyond debate." In particular, while *Estelle* concerns the medical treatment by a prison doctor, the issue of a prison doctor prescribing

23

narcotic medications in a way that does not match an earlier prescription provided by an outside medical care provider was not addressed by the Court. Rather, the caselaw to date has consistently held that reasonable disagreement on medications between providers, as is the case here, is *insufficient* to show deliberate indifference. *Pyles,* 771 F.3d at 409. Accordingly, defendants' conduct here is also protected under the doctrine of qualified immunity. For this additional reason, defendants are entitled to summary judgment as a matter of law.

### ORDER

IT IS ORDERED that:

1) Defendants' motions for summary judgment (dkt. ##72, 76) are GRANTED.

2) Defendants Sandra Ender, Anthony Hentz, Denise L. Hurless, and Tammy Maassen's motion to amend their reply in support of their proposed findings of fact (dkt. # 98) is GRANTED.

3) The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 21st day of July 2026.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24